**E-Filed 8/26/2008**

NOT FOR CITATION

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| SALLY HERRIOT,<br><br>                 Plaintiff,<br><br>     v.<br><br>CHANNING HOUSE,<br><br>                 Defendant. | Case Number C 06-6323<br><br>ORDER[1] DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT, DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY ADJUDICATION |

Plaintiff Sally Herriot ("Herriot") is an eighty-nine year old resident of Channing House, a continuing care retirement community ("CCRC")  located in Palo Alto, California.  It is undisputed that she requires twenty-four hour care, has limited ambulatory capacity and suffers from dementia.  She brought this action pursuant to the Fair Housing Act ("FHA"), the Fair Employment and Housing Act ("FEHA"), the Americans with Disabilities Act ("ADA"), the Rehabilitation Act and California state law following repeated requests by Channing House that she move from her private apartment, in which she lived independently for many years, to an

---

[1] This disposition is not designated for publication and may not be cited.

1   assisted living facility within the community.   Herriot moves for partial summary judgment.

2   Channing House opposes Herriot's motion and moves separately for summary judgment, or in

3   the alternative, summary adjudication.  For the reasons set forth below, both parties' motions for

4   summary judgment will be denied, but Defendant's motion for summary adjudication will be

5   granted.

6                                          **I.  BACKGROUND**

7           Subject to an extensive regulatory scheme established by the State of California, CCRCs

8   function to provide a continuum of personal, nursing and routine medical care to residents over

9   the age of sixty-two.  Channing House offers its residents three levels of care: independent living;

10  assisted living and skilled nursing.  Independent living residents occupy their own apartments

11  without any restrictions on visitation.  Assisted living and skilled nursing care are provided in

12  shared facilities.

13          CCRCs typically are organized under one of several models.  Some offer "Type A"

14  contracts that require a substantial initial entrance fee and monthly fees that do not escalate

15  significantly as care needs increase.  Exhibit 3, Gordon Report 4-5.  "Type B" contracts do not

16  require an entrance fee and involve higher monthly fees related to the actual amount of care a

17  resident needs.  Exhibit 2, Bragnisky Deposition, 107.  "Type C" contracts offer straight fee-for-

18  service health care.  *Id*.  Channing House has offered Type A contracts exclusively since it was

19  established in 1964.

20          In 1992, Herriot and her husband signed a Type A contract and moved into an

21  independent living apartment at Channing House.   The contract contains the following language:

22          when a Resident . . .  Becomes so ill or enfeebled that, in the opinion of the staff
            physician, more efficient care in the best interest of the Resident can be provided
23          in a care or skilled nursing unit . . . . and that is not a temporary condition,
            Channing House shall have authority to transfer resident to the appropriate
24          medical unit.

25   Exhibit 34, Herriot Deposition.  When Herriot's' husband became ill in 2002, he moved into a

26  skilled nursing unit, leaving Herriot as the sole resident of the apartment.  Herriot has remained

27  in her apartment since her husband's death in 2003.

28                                                    2

1    In 2006, Herriot was hospitalized.  At that time, Channing House contacted Herriot and

2  her family informing them that it would be necessary for Herriot to transfer permanently either to

3  assisted living or to skilled nursing when she returned from the hospital.  Herriot, her family and

4  Herriot's personal physician, Dr. Deidre Stegman ("Dr. Stegman"), objected to the transfer.

5  Herriot returned to her apartment and retained private care for sixteen hours each day to assist her

6  with hygiene, dressing and grooming activities.  Dr. Stegman continues to believe that it is in

7  Herriot's best interest to reside in her own apartment and receive private care rather than being

8  transferred to assisted living or skilled nursing.  Dr. Stegman has opined that a transfer would

9  have a pronounced negative effect on Herriot's physical and mental health and would undermine

10  Herriot's will to overcome the physical limitations associated with aging.  Exhibit 20.

11    Channing House continued its efforts to facilitate a transfer following Herriot's return

12  from the hospital.  On April 25, 2006, Herriot received a letter informing her that: "Your physical

13  condition and needs require that you be transferred to our on site Assisted Living Care.  The level

14  of care that you require exceeds that which may be lawfully provided in your current Independent

15  living apartment."  *See* Answer ¶ 34.  On May 4, 2006, representatives of Channing House met

16  with Herriot's family and also sent Herriot a letter confirming that three options had been

17  presented for her, including a proposal that she move into a shared room in the assisted living

18  facility but pay an additional $25.00 a day to convert the room to a private room that she could

19  furnish with some of her own belongings.   On April 19, 2007, Channing House wrote a second

20  letter stating the following:

21        this letter confirms that Channing House assessed you in the manner described to
         you in our letter dated March 15, 2007, and that your personal physician Dr.
22        Deidre Stegman, and two sons, Robert and James attended.
         . . .
23        Channing House has determined that based on your frailty, fall risk, dementia and
         need for assistance with all activities of daily living, you require transfer to a
24        higher level of care in accordance with your continuing care contract.

25

26

27

28                                            3

1   Exhibit 13.[2]  The Medical Director of Channing House, Dr. Jessica Davidson ("Dr. Davidson")

2   has testified that during the period in which the parties exchanged this correspondence, Herriot

3   was not examined by any nurse or physician employed by Channing House and objected to such

4   an examination being performed.  Dr. Davidson explains that instead of conducting an annual

5   assessment, she observed Herriot during two care conferences.  Exhibit 27, 16, 17, 34.

6        Channing House also contacted the California Department of Social Services ("DSS")

7   regarding Herriot's case.  On July 5, 2006, Channing House wrote to Herriot informing her that

8   while her transfer decision was being reviewed, Channing House would arrange for her to have

9   care in her apartment during the hours when her private care provider was not in attendance.  On

10  February 22, 2007, a representative of Channing House contacted DSS indicating that despite

11  Herriot's refusal to allow annual assessments, Channing House had concluded that Herriot was in

12  need of twenty-four hour assistance and had "limited ability to ambulate."  Exhibit 22.  Herriot

13  asserts that the letter of July 5, 2006 was intended not to provide an accurate assessment of her

14  condition but rather to bolster Channing House's relationship with DSS.

15       Herriot has not been transferred.  She twice has requested that as an alternative to transfer

16  she be permitted to remain in her independent living unit and receive private care at her own

17  expense.  She asserts eight claims in the instant action, asking that Channing House be held liable

18  for: (1) discrimination or otherwise making unavailable a dwelling, in violation of 42 U.S.C. §

19  3604(f)(1) and discriminating in the terms, conditions or privileges of occupancy of a dwelling

20  because  of a disability, in violation of 42 U.S.C. § 3604(f)(2); (2) failure to provide her with and

21  denying her the opportunity to participate in or benefit from certain goods, services privileges,

22  advantages and accommodations and failure to make reasonable modifications, in violation of 42

23  U.S. C. §§ 12101; (3) denying her the opportunity to participate and benefit from living at

24

25       [2] On January 26, 2007, Herriot received a letter that was sent to all Channing House
26  residents advising them that "the transfer rules have changed so that instead of being required to
    transfer you on certain statutory grounds, as of January 1, 2007, Channing House will have the
27  discretion to make this determination on a case-by-case basis."  Bragnisky Declaration, Exhibit
    D.  The legal effect of this letter is discussed below.

28                                                  4

1   Channing House, in violation of § 504 of the Rehabilitation Act; (4) discrimination or otherwise

2   making unavailable a dwelling, discriminating in the terms, conditions or privileges of occupancy

3   of a dwelling because of a disability, refusing to make reasonable accommodations, and

4   interfering with, threatening coercing or intimidating her, in violation of Cal. Gov. Code §

5   12900; (5) violating Cal. Civ. Code § 51;(6) denying full and equal access to housing in violation

6   of Cal. Civ. Code § 54(b)(1) and refusing to make reasonable accommodations in rules, policies,

7   practices or services, in violation of Cal. Civ. Code § 54.1(b)(3)(B); (7) violation of Cal. Bus. &

8   Prof. Code § 17200; and (8) negligence.

9       Herriot moves for summary judgment with respect to her first, fourth, fifth and sixth

10  claims.  Channing House moves for summary judgment as to all of Herriot's claims.[3]  The Court

11  heard oral argument on February 8, 2008.  At the hearing, the Court requested that Herriot

12  _____

13  [3] Herriot contends that Channing House actually has moved for *partial* summary
    judgment because it has not addressed the elements of Herriot's discrimination claim brought
14  pursuant to 24 U.S.C. §§ 3604(f)(1) and (2).  Federal Rule of Civil procedure 7(b) provides that
    motions "must . . . State with particularity the grounds for seeking the order.  In its moving
15  papers, Channing House argues that anti-discrimination laws do not require that it permit Herriot
    to remain in her independent living apartment because her proposed accommodation is not
16  reasonable, and providing her with the requested accommodation would constitute a fundamental
    alteration of the CCRC model of care.  These arguments directly address Herriot's
17  accommodation claims.  Channing House asserts that its grounds for denying Herriot's
    accommodation claims "must also absolve Channing House of [Herriot's] discrimination claims .
18  . . which are entirely based on the legality of Channing House's transfer policy. . . . Channing
    House's motion contends only that [Herriot's] proposed accommodation is unreasonable and
19  would fundamentally alter Channing House's model of care, but also, on the same grounds, that
    Channing House's transfer policy cannot constitute discrimination under the anti-discrimination
20  laws."  Channing House Reply Brief at 1.
21      A defendant may overcome a prima facie case of discrimination under 24 U.S.C. §§
    3604(f)(1) and (2) by asserting a legitimate non-discriminatory reason for its action.  *See*
22  *Community House Inc. v. City of Boise*, 490 F.3d 1041, 1053 (9th Cir. 2007).  If proved,
23  Channing House's assertion that the requested accommodation would fundamentally alter its
    model of care would constitute such a legitimate reason.  Accordingly, the Court will treat that
24  argument as directed to Herriot's 24 U.S.C. §§ 3604(f)(1) and (2) claims.
25      However, because neither party directly addresses Herriot's second claim brought
    pursuant to 42 U.S.C. § 12101 or her eighth claim for negligence, the Court declines to address
26  these claims in this order.  Either party may file an appropriate motion with respect to these
27  claims in light of the legal analysis set forth herein.

28                                                          5

undergo an independent medical examination.  On May 29, 2008, the parties submitted a report

prepared by Dr. Ami Laws ("Dr. Laws"), and thereafter submitted comments on Dr. Laws's

report.

## II.  LEGAL STANDARD

A motion for summary judgment should be granted if there is no genuine issue of

material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P.

56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The moving party bears

the initial burden of informing the Court of the basis for the motion and identifying the portions

of the pleadings, depositions, answers to interrogatories, admissions, or affidavits that

demonstrate the absence of a triable issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S.

317, 323 (1986).

If the moving party meets this initial burden, the burden shifts to the non-moving party to

present specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e);

*Celotex*, 477 U.S. at 324.  A genuine issue for trial exists if the non-moving party presents

evidence from which a reasonable jury, viewing the evidence in the light most favorable to that

party, could resolve the material issue in his or her favor.  *Anderson*, 477 U.S. 242, 248-49;

*Barlow v. Ground*, 943 F. 2d 1132, 1134-36 (9th Cir. 1991).

## III.  DISCUSSION

1.    Accommodation and Disparate Treatment Claims

"To make out a claim of discrimination based on failure to reasonably accommodate, a

plaintiff must demonstrate that (1) he suffers from a handicap as defined by the FEHA; (2)

defendants knew or reasonably should have known of the plaintiff's handicap; (3)

accommodation of the handicap 'may be necessary' to afford plaintiff an equal opportunity to use

and enjoy the dwelling; and (4) defendants refused to make such accommodation."  *Giebeler v.

M&B Assocs.*, 343 F.3d 1143, 1147 (9th Cir. 2002).   Once a plaintiff has made such a showing,

the burden shifts to the defendant to produce rebuttal evidence that the accommodation is

Case No. C 06-6323
ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT, DENYING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY
ADJUDICATION
(JFLC1)

1   unreasonable.  It may do so by showing that the accommodation would impose "undue financial

2   or administrative burdens" or a "fundamental alteration of the nature of the program." *Id*. at

3   1157.

4          Plaintiffs seeking to assert a disparate treatment claim first must establish a *prima facie*

5   case.  Here, Herriot must show that: (1) she has a disability; (2) she was qualified to remain in an

6   independent living apartment; (3) Channing House took steps to move her involuntarily;[4] and (4)

7   Channing House permitted other residents similarly situated who do not fall within the protected

8   category to remain in their apartments.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792,

9   802-03 (1973)*; Gamble v. City of Escondido*, 104 F.3d 300, 305 (9th Cir. 1997).  Once the

10  plaintiff has established a *prima facie* case, the burden shifts to the defendant, who must

11  articulate a legitimate non-discriminatory reason for the application of its policies.  If this burden

12  is met, plaintiff must prove by a preponderance of the evidence that the reason asserted by the

13  defendant is pretextual.

14         In this instance, each of these claims turns on the question of whether Herriot's requested

15  accommodation is reasonable.  Channing House asserts that the accommodation is unreasonable

16  per se because it would require Channing House to violate California law.  Herriot's independent

17  living apartment is licensed as an Residential Care Facility for the Elderly ("RCFE"), as defined

18  by Health & Safety Code § 1569.2(k).[5]  Under 22 Cal. Code Reg. § 87455(c)(2),"[n]o resident

19  _____

20         [4] The second and third elements of a disparate treatment prima facie showing typically
    requires the plaintiff to show that: (1) plaintiff applied for housing; and (2) that application was

21  denied.  *See, e.g.*, *Community House, Inc. v. City of Boise*, 490 F.3d 1041, 1052 (9th Cir. 2006)
    (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973).  However, the Ninth

22  Circuit has adopted this test to fit the facts of the case at hand when necessary.  *See Gamble v.
    City of Escondido*, 104 F.3d 300 (9th Cir. 1997).

23

24         [5] A Residential Care Facility for the Elderly is defined as:

25
    a housing arrangement chosen voluntarily by persons 60 years of age or over, or

26  their authorized representative, where varying levels and intensities of care and
    supervision, protective supervision or personal care are provided, based upon their

27  varying needs, as determined in order to be admitted and to remain in the facility.

28                                              7

1   shall be accepted or retained [ in a Residential Care Facility] if . . [t]he resident requires 24-hour,

2   skilled nursing or intermediate care." Additionally, 22 Cal. Code Reg. § 87615(a)(5), prohibits an

3   RCFE from retaining "[r]esidents who depend on others to perform all activities of daily living for

4   them as set forth in Section 87459."  22 Cal Code Reg. § 87459 refers to the need for assistance

5   with the following activities: bathing; dressing and grooming; use of the toilet transferring in and

6   out of a bed or chair; continence; eating; vision; hearing; speech; and walking.

7          Dr. Laws found that Herriot requires and currently is receiving twenty-four hour care and

8   is suffering from dementia.  The report states that Herriot "needs help with all her ADL's[6]

9   including bathing, dressing, going to the toilet, transferring from bed to chair [and] feeding . . . ."

10  These findings are consistent with Channing House's assessment of April 9, 2007 and with

11  Herriot's own admission that she needs assistance with the activities of daily living.  *See* Shea

12  Declaration, Exhibit A, ¶ 19.  Herriot argues that pursuant to the statutory and regulatory changes

13  referenced in Channing House's letter to its residents dated January 26, 2007, Channing House is

14  under no legal obligation to transfer her and may (and should) exercise its discretion to allow her

15  to remain where she is.

16         Were the medical evidence more equivocal, there well might be a triable issue of fact as to

17  whether Channing House would face legal liability for allowing Herriot to remain in her

18  independent living apartment.  However, the record as supplemented by Dr. Laws's independent

19  medical examination establishes conclusively that Herriot requires a type and degree of care that

20  Channing House may not lawfully provide in an independent living unit.  22 Cal. Code Reg. §

21  87455(c)(2); 22 Cal. Code Reg. § 87615(a)(5).  Put differently, to the extent that the new

22  regulatory scheme vests it with discretion, Channing House may not exercise that discretion in a

23  manner inconsistent with the regulations.  Accordingly, the Court concludes that Herriot's

24  requested accommodation is unreasonable and that Channing House has a legitimate non-

---

26  Health & Safety Code § 1569.2(k).

27         [6] Activities of Daily Living.

28                                         8

1   discriminatory reason for both its policy and its decision to transfer Herriot.[7]

2   2.       State-Law Claims

3           California Gov. Code § 12955 provides: "[i]t shall be unlawful . . . for the owner of any

4   housing accommodation to discriminate against or harass any person because of the . . . disability

5   of that person."  For purposes of the provision, "discrimination" is defined, in part, as "refusal to

6   make reasonable accommodations in rules, policies, practices or services when these

7   accommodations may be necessary to afford a disabled person equal opportunity to use and enjoy

8   the dwelling.  Cal. Gov. Code § 12927.  "Because California law under Fair Employment Housing

9   Act (FEHA) mirrors federal law under Title VII, federal cases are instructive in analyzing FEHA

10  claims. *Grosz v. Boeing Co.*, 455 F. Supp. 2d 1033, 1039 (E.D. Cal. 2006).  Herriot's California

11  Civil Code §§ 51 and 54.1 claims likewise require a finding of discrimination according to

12  analysis under federal law.  *Hawkins v. El Torito Rests., Inc.*, 63 Cal. App. 4th 510, 523-24 (Cal.

13

14  _____

15        [7] Channing House also argues that the proposed accommodation is unreasonable in light
    of Herriot's continuing care contract, which expressly provides Channing House with the
16  discretion to make transfer decisions.  That contract provides, in relevant part, that:

17          [w]hen a Resident . . . becomes so ill or enfeebled that, in the opinion of the staff
            physician, more efficient care in the best interest of the Resident can be provided
18          in a care or skilled nursing unit . . . And that it is not a temporary condition,
            Channing House shall have authority to transfer [the] Resident to the appropriate
19          medical facility.

20
21  Exhibit 34.  This provision, to which Herriot agreed when she because a resident of Channing
    House, vests Channing House with considerable discretion separate and apart from that available
22  to it under the regulatory scheme.  However, such discretion is not limitless, and the standard to
    be applied – the best interest of the resident – is different from that applicable to determinations
23  made pursuant to the regulatory scheme.  Indeed, Dr. Laws agrees with Dr. Stegman that moving
    Herriot to skilled nursing facility would *not* be in Herriot's best interest and that Herriot likely
24  would suffer both physically and mentally.  It is not the Court's function on a motion for
    summary judgment to evaluate the reasonableness of Channing House's assessment to the
25  contrary.  Although it concludes that California law effectively requires Channing House to
    transfer Herriot to a skilled nursing facility, the Court does so with considerable reluctance in
26  light of Dr. Stegman's and Dr. Laws's opinions as to the potential effect of the transfer on
    Herriot.  *See also* n.7, *infra*.
27

28                                        9

1  Ct. App. 1998).  For the reasons discussed above, the Court concludes that Channing House is

2  entitled to summary adjudication with respect to Herriot's FEHA claims.  Accordingly, the Court

3  will grant summary adjudication with respect to Herriot's claim under the California Government

4  Code.

5       California's Unfair Competition Law ("UCL") defines "unfair competition" to include

6  "any unlawful, unfair or fraudulent business act or practice."  Cal. Bus. & Prof. § 17200.  By

7  proscribing any "unlawful" business practice, the UCL "borrows violations of other laws and

8  treats them as unlawful practices that the unfair competition law makes independently actionable."

9  *Cel-Tech Communications, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal.4th 163, 180 (1999).

10  Because Herriot cannot prevail on any of the claims adjudicated by this Order, the Court will

11  grant summary adjudication of her § 17200 claim as well.

12  3.      Rehabilitation Act Claim

13       Channing House moves for summary judgment with respect to Herriot's fourth claim

14  brought pursuant to Rehabilitation Act § 504 on the grounds that Channing House is not a

15  recipient of federal funding.  Herriot concedes that claim.

16                                    **IV.  ORDER**

17       Good cause therefor appearing, IT IS HEREBY ORDERED that Herriot's motion for

18  summary judgment is DENIED.  Channing House's motion for summary judgment is DENIED

19  without prejudice; its motion for summary adjudication is GRANTED as set forth above.  In light

20  of the impending trial date of September 26, 2008, counsel are directed to attend a case

21  management conference on September 5, 2008 at 10:30 am to discuss future proceedings in this

22  matter in light of this order.[8]

23

24  ─────────────────

25       [8] Because of the highly sensitive nature of this case, the Court again invites the parties
    and counsel to explore the possibilities of a mediated settlement, perhaps one that involves an

26  agreed timetable for Herriot's transfer that will mitigate at least in part any physical and mental
    detriment to Herriot.  With the parties' consent, the Court is willing to provide direct assistance

27  in this regard.

28                                      10

1

DATED: August 26, 2008

2

3
_____
JEREMY FOGEL
United States District Judge

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

11

1   This Order has been served upon the following persons:

2

    Kerstin Arusha          kerstina@lawfoundation.org
3
    Kimberly Pederson       kimp@lawfoundation.org
4
    Susan Ann Silverstein
5   AARP Foundation Litigation
    601 E Street NW
6   Room A4-140
    Washington, DC 20049
7
    James F Zahradka, II         jamesz@lawfoundation.org
8
    Kyra Ann Kazantizis
9   Public Interest Law Firm
    Law Foundation of Silicon valley
10  111 W. St. John St.
    Suite 315
11  San Jose, CA 95113

12  Michael Allen          mallen@relmanlaw.com

13  Alexander A. Graft     graft@lbbslaw.com

14  George John Ziser      ziser@lbbslaw.com

15  James Anthony Napoli       jnapoli@hansonbridgett.com

16  Paul A. Gordon         pgordon@hansonbridgett.com

17

18

19

20

21

22

23

24

25

26

27

28
                                    12
    Case No. C 06-6323
    ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT, DENYING DEFENDANT'S
    MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY
    ADJUDICATION
    (JFLC1)